[No. 31387. *En Banc.* April 15, 1950.]

THE STATE OF WASHINGTON, *on the Relation of Smith Troy, as Attorney General, Plaintiff,* v. CLIFF YELLE, *as State Auditor, et al., Respondents.*[1]

[1] Reported in 217 P. (2d) 337.

*Richard Thorgrimson, Special Assistant Attorney General* (*Preston, Thorgrimson & Horowitz,* of counsel), for relator.

*Lyle L. Iversen, Assistant Attorney General,* for respondents.

HILL, J.—The relator seeks writs of mandate directed to the state auditor and the state treasurer. These will be discussed separately.

He seeks to compel the state auditor to refrain from issuing and to cancel nineteen registered general fund warrants written but not delivered, for the reason that there are already outstanding more than $400,000 of such warrants which cannot be paid for want of funds, and, therefore, the warrants in question are in excess of the constitutional debt limitation. It is admitted that these warrants are issued within, and pursuant to, appropriations made by the legislature for the current biennium. It is estimated that, in the absence of legislative action to increase revenues or decrease expenditures, there may be, by the end of the present biennium, upwards of fifty million dollars in warrants

drawn on the general fund for which there will be no money available for payment as of that date. The question of whether or not such warrants constitute a debt within the constitutional debt limitation provisions of our state constitution is therefore of considerable importance.

We quote certain pertinent provisions of our state constitution:

"All property in the state not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. *The legislature shall provide by law for an annual tax sufficient, with other sources of revenue, to defray the estimated ordinary expenses of the state for each fiscal year. And for the purpose of paying the state debt, if there be any, the legislature shall provide for levying a tax annually, sufficient to pay the annual interest and principal of such debt within twenty years from the final passage of the law creating the debt.*" (Italics ours.) Art. VII, § 1 (repealed in 1930 by the fourteenth amendment, but important as casting light on the meaning of the word "debt" as used in Art. VIII).

"*Whenever the expenses of any fiscal year shall exceed the income, the legislature may provide for levying a tax for the ensuing fiscal year, sufficient, with other sources of income to pay the deficiency, as well as the estimated expenses of the ensuing fiscal year.*" (Italics ours.) Art. VII, § 8.

"The state may, to meet casual deficits or failure in revenues or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and *the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained, or to repay the debts so contracted, and to no other purpose whatever.*" (Italics ours.) Art. VIII, § 1.

"In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but *the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and no other purpose whatever.*" (Italics ours.) Art. VIII, § 2.

"Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by or on be-

half of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, *for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof.* . . ." (Italics ours.) Art. VIII, § 3.

It is our interpretation that "debt," within the purview of Art. VIII, §§ 1, 2 and 3, is borrowed money and not warrant obligations for the payment of the current expenses of the state government such as services rendered and materials furnished.

We make no pretensions to infallibility or absolute certainty, nor are all of us persuaded that the result achieved is a desirable one under our present system of taxation. We are persuaded, however, that the framers of the constitution had in mind two types of obligations, those for current expenses and those for the repayment of money borrowed, and that, as used by them, the word "debt" in Art. VIII, §§ 1, 2 and 3, and Art. VII, § 1 (as originally adopted), had reference only to the second type of obligation.

Art. VII, § 1 of the constitution as originally adopted, contained the mandate that the legislature should provide for an annual tax sufficient, with other sources of revenue, to defray "the estimated ordinary expenses of the state for each fiscal year." It further required that, for the purpose of paying the "state debt," the legislature should provide for an annual tax sufficient to pay the annual interest and to retire the principal of such debt within twenty years from the final passage of the law creating the debt. This, it seems to us, connotes a debt created by law in a specific amount, payable within twenty years. Such is the interpretation of similar constitutional provisions (hereinafter set out in full) by the Oklahoma supreme court. *In re Application of State to Issue Bonds to Fund Indebtedness*, 33 Okla. 797, 127 Pac. 1065.

The framers of the constitution also recognized that the expenses of any fiscal year might exceed the income

(which is the situation which brings about the present critical situation with reference to state finances), and they provided for that situation in Art. VII, § 8, quoted above, by providing that the legislature may levy a tax for the ensuing fiscal year "sufficient, with other sources of income to pay the deficiency, as well as the estimated expenses of the ensuing fiscal year."

Reading these sections together, we find a definite distinction between the excess of expenses over income in any fiscal year, as referred to in Art. VII, § 8, and the state debt, as referred to in Art. VII, § 1, the latter being specific amounts of money borrowed for specific purposes.

The same concept of state debt is carried over into Art. VIII. The legislature may, as we have seen (Art. VII, § 8), provide for a tax in the ensuing fiscal year to pay the deficiency in current operating expenses. Art. VIII, § 1, provides that the state may "contract debts," or, as we interpret it, borrow money, but not in excess of a total of $400,000, for the purpose of meeting such deficits, and

". . . the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained, or to repay the debts so contracted, and to no other purpose whatever."

It is urged that when a warrant is drawn in payment of services rendered or materials furnished, a debt is created, or the warrant is evidence of a debt created when the labor was performed or the materials furnished. The distinction between such a warrant indebtedness and the debt referred to in Arts. VII and VIII of our constitution is further clarified by Art. VIII, § 1, in the statement that, for the purpose of meeting "casual deficits or failure in revenues or for expenses not provided for," the state may "contract debts." The "casual deficits" which are to be met by contracting a debt, *i.e.*, by securing a loan, already exist in the form of warrants which cannot be paid; and, a loan having been secured and the warrants thus paid, the "casual deficits" previously evidenced by warrants become a debt within the purview of Art. VIII, § 1.

As we go on to Art. VIII, § 2, we find that, in addition to the limited power to contract debts referred to in Art. VIII, § 1, the state may "contract debts" for certain great emergencies, but

" . . . the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and no other purpose whatever."

Here again, "the money arising from the contracting of such debts" seems to us to imply a borrowing of money.

The only time that this section has ever been used as an authorization for incurring a debt was in 1933, when this court approved a bond issue of $10,000,000 for emergency relief. *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1.

In Art. VIII, § 3, we find the positive prohibition that no debt shall be contracted by or on behalf of the state except the debts specified in the two preceding sections, unless it shall have been authorized by law (and approved by the people) for some single work or object, which law shall provide ways and means

" . . . for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. . . ."

Here again it seems to us that, when the men who drafted the constitution used the word "debt," they were thinking solely in terms of borrowed money.

The only time that this section of the constitution has been invoked as authorizing a debt was for the veterans' bonus bonds after World War I. *State ex rel. Hart v. Clausen,* 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580.

Our interpretation that the debt prohibition and limitations of Art. VIII, §§ 1, 2 and 3, were not intended to apply to that class of pecuniary obligations or indebtedness arising out of the ordinary current expenses of maintaining the state government, is the only interpretation that fits the practicalities of the situation which existed in 1889, when the constitution was adopted. For many years prior to the

adoption of the constitution, the *ad valorem* property tax was the principal source of revenue for the territorial government; for many years subsequent to its adoption, the same tax was the principal support of the state government. As a practical proposition, it was obvious that the expenses of operating the state government antedated by months the arrival in the state treasury of the taxes levied to meet those expenses. The framers of the constitution knew that warrants issued in anticipation of revenues from the taxes levied represented the only way of financing the operation of the state during the lag between the levy and the payment of taxes; and the Honorable Elisha P. Ferry, who served as a territorial governor and as the first governor of the state, was announcing no new discovery when he called the attention of the legislature to the fact that:

" . . . More than three-fourths of the expenses of the state for the fiscal year are incurred and warrants drawn upon the treasury for the payment thereof, before the receipt of any available funds for their redemption." Senate Journal, 1893, p. 16.

In fact, as was pointed out in *Rauch v. Chapman,* 16 Wash. 568, 48 Pac. 253, 58 Am. St. 52, 36 L. R. A. 407:

"The state itself inherited from its territorial form liabilities which very nearly equaled the limitation on state indebtedness prescribed in § 1, art. 8 of the constitution";

and the first legislature provided for the issuance of bonds in the amount of $300,000 to liquidate the territorial warrant indebtedness. Laws of 1889-1890, chapter 2, p. 32.

Governor John H. McGraw, in a message delivered to the legislature on January 14, 1895, called attention to the fact that in the 1893 legislature, there had been unquestioned confidence in the capacity of the state to redeem its warrant debt speedily. Senate Journal, 1895, p. 10. The 1893-1895 biennium saw a panic; assessed valuations dropped; tax collections slumped; the general fund cash revenues for the biennium ($1,155,733.18) were only about half the amount of the appropriations ($2,259,511.08), and the warrant indebtedness of the general fund at the end of that biennium

amounted to $1,298,641.90, drawing interest at eight per cent per annum. Financial History of the State of Washington, Statehood to March 31, 1923.

The 1895 legislature sought to alleviate the financial crisis by authorizing issuance of bonds bearing interest of not to exceed four per cent per annum, for the purpose of funding the outstanding warrants drawn on the general, military, and tideland funds. Laws of 1895, chapter 169. Historically of interest but of little value as precedent in our present inquiry are the cases of *State ex rel. Jones v. McGraw,* 12 Wash. 541, 41 Pac. 893, and *State ex rel. Winston v. Rogers,* 21 Wash. 206, 57 Pac. 801, the first of which was initiated shortly after the enactment of the 1895 law.

From the record in *State ex rel. Jones v. McGraw, supra,* it appears that by July of 1895 the general fund warrant indebtedness had increased to $1,334,571.08 and warrants could not be redeemed for upward of a year and a half after they were issued, and that there were also nonpayable warrants drawn on the military and tideland funds in the amounts of $96,651.50 and $75,381.91 respectively, making an aggregate warrant indebtedness of $1,506,604.49. The attorney general sought to compel the governor and others constituting the state board of finance, to issue the bonds authorized by the legislature, in order to liquidate this warrant indebtedness.

This court held that issuance of the bonds would be a violation of Art. VIII, § 1 of the constitution, limiting the debt which the state could incur for the purpose of meeting "casual deficits or failure in revenues or for expenses not provided for" to the sum of $400,000. The validity of the outstanding nonpayable warrants was not questioned; and the language of the court indicates that they were regarded as debts, though not of the character referred to in the constitution; and that, if the bonds provided for would have extinguished the existing indebtedness instantly, and would have resulted in no new indebtedness, the decision might have been different. We quote the language upon which the case was subsequently distinguished:

"Nor is it, in our opinion, a sufficient answer to say that it must be presumed that the officers entrusted to carry out the provisions of this act will fully discharge their duties, and that the present indebtedness of the state will be extinguished by the proceeds of the bonds, and ultimately the indebtedness of the state be reduced to its present limit. The prohibition in the constitution is that 'such debts, . . . singly or in the aggregate, shall not at any time exceed four hundred thousand dollars,' and constitutes an 'impassable barrier' to the creation of any indebtedness in excess thereof for any period of time, however brief, or for any purpose, however worthy."

The court, in that opinion, cited and quoted only two cases, *Doon Township v. Cummins*, 142 U. S. 366, 35 L. Ed. 1044, 12 S. Ct. 220, and *Bannock County v. C. Bunting & Co.*, 4 Idaho 156, 37 Pac. 277, both of which involved the issuance of bonds to fund existing indebtednesses. The determinative point in each of those cases was that the sale of the bonds would increase the indebtedness until the already existing indebtedness was paid, and such payment depended upon the discretion and honesty of certain officers.

Chief Justice Hoyt dissented in *State ex rel. Jones v. McGraw, supra*, stating that the 1895 act merely provided authority "to change the form of the evidences of the debt which was owed by the state, and did not in any manner contemplate the increase of such debt." He continued:

"If this be so, a compliance therewith would not be the creation of a debt, within the meaning of the constitutional provision upon that subject. The issuing of a warrant in the ordinary course of business is not the creation of a debt. The obligation for which the warrant is issued is the debt which the state owes, and the issuance of the warrant is the method provided by statute for the payment thereof. When there is no money in the treasury to meet a warrant issued for that purpose, such warrant may constitute the evidence of the indebtedness, but not the indebtedness itself. Warrants which there is money in the treasury to pay are not in any sense an indebtedness of the state. For this reason I am unable to agree with the conclusion of the majority that, until the money realized from the sale of the bonds had been actually applied upon the warrants for the payment of which such money had been placed in the treasury, such warrants,

as well as the bonds, would be an indebtedness of the state, or even evidence of such indebtedness. That the legislature has the authority to authorize a change in the form of the indebtedness of the state is beyond question, and, in my opinion, the statute in question did no more."

The most significant thing about the opinion in that case is that both the majority and the dissenting judge assumed the validity of the existing warrants, whether regarded as debts or as evidences of debt. The majority held that bonds intended to fund the existing warrant indebtedness would constitute an unconstitutional increase in the state debt; the dissent said that the proposed bond issue was merely a change in the form of an existing indebtedness and the constitutional provision had no application.

The 1899 legislature made the next effort to deal with the problem of the warrant indebtedness, which by the end of the 1895-1897 biennium, as to warrants drawn on the general fund, amounted to $1,918,333.66 but which was reduced to $1,441,694.96 by the end of the 1897-1899 biennium. By the Laws of 1899, chapter 44, it was provided that, whenever there was outstanding a general fund warrant indebtedness in excess of $5,000, and whenever there was $5,000 or more in the state permanent school fund "of which no investment can be made in the securities now or hereafter authorized by law," the governor and the auditor should issue a bond to the state of Washington in the amount of $5,000 and sell and deliver the bond to the state treasurer for the acount of the state permanent school fund. These bonds were to bear interest at the rate of three and one-half per cent per annum and were to be payable within twenty years out of the general fund. It was provided that the money transferred from the permanent school fund to the general fund from the sale of the bonds should be "at once used in the redemption of outstanding general fund warrants."

Bonds in the amount of $175,000 were immediately issued under the act. This amount, with the then outstanding bonded indebtedness of $225,000 (the unpaid balance of the

$300,000 of bonds issued in 1890 to pay off the territorial warrant indebtedness), brought the total bonded indebtedness to $400,000. However, there was still money in the permanent school fund which under the act could be invested in general fund bonds, and there were still outstanding general fund warrants in excess of one million dollars. In *State ex rel. Winston v. Rogers, supra,* the attorney general sought to restrain and enjoin the issuance by the governor and the auditor of a particular $5,000 bond which would raise the bonded debt of the state to $405,000. By the agreed statement of facts it was stipulated that

" . . . at the time of the beginning of this suit, and now, the State of Washington is in possession of, and has due and owing to it, cash on hand, uncollected taxes and other assets greatly exceeding its entire indebtedness, including its bonded indebtedness, to-wit, exceeding such indebtedness in the sum of $1,000,000."

This court said that the problem presented was whether the state would exceed its debt limit by the issuance of the bond in question. The question was discussed solely from the standpoint of whether there would be an increase in the indebtedness of the state by the transaction. While it was pointed out that taxes due and cash in the treasury must be subtracted from the outstanding indebtedness to determine the debt limitation of a county and that a similar rule should apply to the state, it was said:

"It is not necessary to go further now than to state the proposition that when the bond in the sum of $5,000 is delivered to the state treasurer the sum of $5,000 is placed in the general fund of the state. Thus there is no increase of the indebtedness of the state, or of its liability, when this view is adopted."

It was, of course, necessary to distinguish *State ex rel. Jones v. McGraw, supra.* This was done by pointing out that the bonds to be issued under the 1895 act were to be sold and the proceeds used to pay the outstanding warrants, and during the interval the indebtedness would be increased, and it was said:

"But the argument upon which the conclusion is based in *State ex rel. Jones v. McGraw, supra,* is not applicable to the case at bar. There is no interval here between the delivery of the bond and the placing of the money in the general fund of the treasury; the acts are simultaneous. The money is already in the treasury, and is merely transferred from one fund to another, and there is nothing conditioned upon the discretion or honesty of the officers. It may be further observed that the indebtedness inhibited in art. 8, *supra,* of the constitution does not relate specifically to the form, whether bonds or warrants, but that the term 'debt' is used in its ordinary signification. And under the provisions of the act of March 8, 1899, *supra,* when the money placed in the general fund is paid out in cancellation of general fund warrants there is yet no increase of debt."

The relator places great stress upon the next to the last sentence in the foregoing quotation, as indicating that the court considered that a debt is a debt within the purview of Art. VIII, whether in the form of bonds or warrants. The statement was *obiter,* without any analysis of the pertinent provisions of the constitution, and difficult to harmonize with the court's decision. An increase of the bonded debt over the $400,000 limitation fixed by Art. VIII, § 1, was approved, apparently on the theory that there was no increase in indebtedness because the proceeds of the sale of the bonds immediately reduced the amount of the warrant indebtedness by a like amount.

Based upon the 1899 enactment as interpreted by the decision just referred to, the state issued $775,000 of general fund bonds during the 1899-1901 biennium, $605,000 during the 1901-1903 biennium, and lesser amounts in succeeding bienniums to and including the 1909-1911 biennium. The total amount of bonds issued was $2,625,000, but the highest total of such bonds outstanding at the end of any biennium was $1,250,000, on March 31, 1905. This bonded indebtedness had been paid off in full before March 31, 1913, and, so far as we are presently advised, no general fund bonds have since that date been issued under the terms of the 1899 law, which still remains on our statutes. Rem. Rev. Stat., §§ 5540-5545 [P.P.C. §§ 956-47 to 956-57], inclusive.

While the opinion in *State ex rel. Winston v. Rogers, supra,* had to do only with the bond which increased the indebtedness from $400,000 to $405,000, it is obvious that there was no limit except the amount of the general fund warrant indebtedness and the amount in the permanent school fund available for investment under the terms of the 1899 act. A bonded indebtedness of $405,000 or $1,250,000, or any amount in excess of $400,000, could be justified, it seems to us, only on the theory (adopted in Oklahoma under similar constitutional provisions) that the warrants did not constitute a debt within the purview of the constitution and, therefore, the bonds which were issued to refund the warrants did not constitute a debt within the purview of the constitution, being merely a change in the form of the state's obligations.

There is likewise authority from other jurisdictions supporting the interpretation we have placed on the word "debt" as it is used in Art. VIII, §§ 1, 2 and 3 of our constitution. Many states have constitutional provisions generally similar to those sections of our constitution, but they are of little value for the purpose of determining the proper meaning of our constitutional provisions if they do not contain the language to which we have referred as the basis for our belief that the men who drafted the Washington constitution had in mind a distinction between two types of obligations; one arising from deficits in current operations of the state government and the other being money borrowed for state purposes. We shall therefore confine our discussion to Oklahoma, because at the time similar questions were considered in that state, it had constitutional provisions practically identical to those of our own constitution. In the following quotations from the Oklahoma constitution (prior to the 1941 amendment, hereinafter referred to), we have indicated all dissimilarities in wording between the Oklahoma provisions and those of our constitution heretofore quoted, by italicizing words and phrases in the Oklahoma constitution which do not appear in our constitution, and by inserting in brackets those words and phrases which appear in the

Washington provisions but are not in the Oklahoma constitution. This comparison indicates a striking similarity and identical wording in those portions here construed.

"The Legislature shall provide by law for an annual tax sufficient, with other *resources* [sources of revenue], to defray the estimated ordinary expenses of the State for each fiscal year." Oklahoma constitution, Art. X, § 2, compared to Washington constitution, portion of Art. VII, § 1 as originally adopted.

"For the purpose of paying the State debt, if [there be] any, the Legislature shall provide for levying a tax, annually, sufficient to pay the annual interest and principal of such debt within *twenty-five* [twenty] years from the final passage of the law creating the debt." Oklahoma constitution, Art. X, § 4, compared to Washington constitution, portion of Art. VII, § 1 as originally adopted.

"Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal year, *which, with other resources, shall be* sufficient [with other sources of income] to pay the deficiency, as well as the estimated *ordinary* expenses of *the State for* the ensuing year." Oklahoma constitution, Art. X, § 3, compared to Washington constitution, Art. VII, § 8.

"The State may, to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars [($400,000)], and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever." Oklahoma constitution, Art. X, § 23, compared to Washington constitution, Art. VIII, § 1.

"In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war; but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, *or to repay such debts,* and *to* no other purpose whatever." Oklahoma constitution, Art. X, § 24, compared to Washington constitution, Art. VIII, § 2.

"Except the *debts* [debt] specified in sections *twenty-three* [one] and *twenty-four* [two] of this article, no debts shall *be* hereafter [be] contracted by or on behalf of this

State, unless such debt shall be authorized by law for some [single] work or object, to be distinctly specified therein; *and such* [which] law shall *impose and* provide *for the collection of a direct annual tax to pay, and sufficient to pay* [ways and means, exclusive of loans, for the payment of] the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within *twenty-five* [twenty] years from the time of the contracting thereof. . . . " Oklahoma constitution, Art. X, § 25, compared to Washington constitution, Art. VIII, § 3.

The Oklahoma supreme court held that the "state debt" referred to in Art. X, § 4, had reference to the debts contracted under §§ 23 to 25, inclusive, of that article (*In re Application of State to Issue Bonds to Fund Indebtedness,* 33 Okla. 797, 127 Pac. 1065); that "state debt" is such an obligation as the legislature is required to provide for by levying an annual tax to pay the annual interest and establish a sinking fund to liquidate the principal at maturity, and does not include any pecuniary obligation which is to be satisfied out of the current revenues for the year (*Baker v. Carter,* 165 Okla. 116, 25 P. (2d) 747); and that Art. X, § 23, of the Oklahoma constitution applies only to such state debts (*Graham v. Childers,* 114 Okla. 38, 241 Pac. 178).

By *In re Application of State to Issue Bonds to Fund Indebtedness, supra,* as in *State ex rel. Winston v. Rogers,* 21 Wash. 206, 57 Pac. 801, state bonds in excess of the $400,000 debt limitation were authorized to be issued to fund warrant indebtedness. The Oklahoma court there held that: (a) Warrants issued in payment of the ordinary necessary current expenses of maintaining the state government, intended in good faith to be paid and lawfully payable out of the current yearly revenues, are valid obligations of the state but are not debts within the purview of Art. X, § 23, of the Oklahoma constitution; and (b) if the state then owes the sums represented by these warrants, the issuing of funding bonds in lieu of the valid pre-existing obligations neither creates a debt nor increases the indebtedness of the state.

Based on that decision, rendered in 1912, the state of Oklahoma had by 1940 built up a bonded indebtedness of $25,373,681, all of the bonds having been issued to pay outstanding warrants. We mention this so that the seriousness of the financial situation in Oklahoma at that time may be understood.

In 1940, the Oklahoma supreme court rendered an opinion in *State ex rel. Phillips v. Carter,* 186 Okla. 571, 99 P. (2d) 1025, in which the governor sought to compel the issuance of nonpayable warrants of the state in payment of current claims incurred by various institutions, departments, officers and employees pursuant to appropriations made by the legislature. It was the auditor's position that, there being more than $400,000 of unpaid and nonpayable warrants outstanding, the issuance of additional warrants would result in a violation of the constitutional debt limitation. (The similarity to the present case is readily apparent.)

The majority of the Oklahoma court held that warrants were authorized to be issued to the full extent of the appropriations, notwithstanding the fact that the revenues provided failed to meet the appropriations, and that such nonpayable warrants were not considered debts within the meaning of the state constitution limiting and prohibiting state debt. Seven of the judges of the Oklahoma court signed the opinion so holding, one dissented, and one concurred solely on the basis that it did not then appear that there would not be sufficient revenue within the current biennium to pay the specific warrants involved.

It was pointed out in the dissenting and concurring opinions that, despite the constitutional prohibition of any indebtedness over $400,000 (Oklahoma constitution, Art. X, § 23), there had been built up a bonded indebtedness of more than $25,000,000 for the purpose of funding nonpayable warrants. Reference was made to the "perfect but simple circle" of excessive appropriations, followed by the issuance of warrants which could not be paid, followed by the issuance of funding bonds to pay the warrants, resulting in

a constantly increasing bonded debt. The concurring judge aptly commented:

"The taxpayers do well to pay the ordinary current expenses of government, without being required to pay large sums for the ordinary expenses of prior years."

The judge who dissented quoted only that portion of Art. X, § 23, of the Oklahoma constitution which read:

"The State may, to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars. . . .";

and concluded that a warrant which could not be paid was a debt, and that all debts in excess of $400,000 were prohibited. If that were the only provision of the Oklahoma constitution with which that court was concerned, we might agree with his interpretation. Similarly, if in the present case we could limit our consideration to the same portion of our own identical constitutional provision (Art. VIII, § 1), we might be of the same opinion as to what constitutes a state debt. But in the light of the language of the remainder of the same section, which the dissenting judge did not quote, and in the light of the other pertinent and comparable provisions in both the Oklahoma and Washington constitutions, we are convinced, as heretofore stated, that the state debt referred to in those provisions is borrowed money and not a deficit in current operating expenses.

The following year (1941) the voters of Oklahoma amended their constitution, providing, among other things, that no department, institution, or agency of the state can incur obligations in excess of the unencumbered balance of the surplus cash in the state treasury allocated to it. It is a very stringent and probably a very admirable pay-as-you-go constitutional provision, with no apparent leeway beyond the power of the governor to issue deficiency certificates up to $500,000 in any fiscal year.

The relator here argues that, since the people of Oklahoma adopted this amendment to their constitution, the

majority of the Oklahoma court must have been wrong in its interpretation as to what constituted state debts under the constitutional provision as it had been. It seems to us that it indicated only that a constitutional amendment was necessary to remedy an undesirable situation. It may even be that the present situation points to the desirability of such a constitutional amendment in this state.

The raising of state revenues by sales taxes, inheritance taxes, business and occupation taxes, *etc.*, makes such a constitutional provision as Oklahoma's present one practicable in 1950; but we are construing an 1889 constitution to meet the situation when revenues were derived almost entirely from *ad valorem* taxes and which, by its terms, recognizes a distinction between debts as represented by loans or borrowed money and those debts resulting from deficits in the current operations of the state. We would point out in passing that Oklahoma's perfect but very vicious circle, heretofore referred to, and the resultant unchecked deficit financing that threatened the financial credit of that state, came not from the holding that warrants were not debts within the purview of the constitution, but from the very questionable reasoning that, because they were not debts within the purview of the constitution, the moneys borrowed to pay them and evidenced by bonds were not debts within the constitutional prohibition and limitations, and that nothing was involved in such funding transactions except a change in the form of an existing indebtedness.

We say "questionable reasoning" because, while we agree with the supreme court of Oklahoma that nonpayable warrants are not debts within the state's constitutional provisions, it does not follow that money borrowed on a bond issue for the purpose of paying the warrants does not constitute a debt within the constitutional limitation and prohibition, and it is there that we would break Oklahoma's "perfect circle." The form of the obligation, and when it was to be paid, were matters of importance to the men who prepared the constitution. They contemplated the financing of the state government with warrants issued in anticipa-

tion of the receipt of taxes and other revenues; and they recognized that situations would arise where the expenses of the fiscal year would exceed the income and that the deficit would be represented by a warrant indebtedness. The constitution evidences their intention that the next legislature should provide for the immediate payment of that indebtedness from current revenues (Washington constitution, Art. VII, § 8), and, to prevent the postponement of the day of reckoning and the shifting of ultimate payment to another generation of taxpayers by borrowing money to meet such deficits, they limited the amount of the debt that could be incurred for that purpose to $400,000. They thought that they were thereby insuring economy in the management of the state's business.

It is true that we followed, to some extent, what we have termed the "questionable reasoning" of the Oklahoma court, in our case of *State ex rel. Winston v. Rogers, supra*. That decision opened the door, as we have indicated, to a state bonded indebtedness of $1,250,000 by the end of the 1903-1905 biennium. We are fortunate in this state that the limitations of the act and the high regard for their constitutional duties by both the governors and the legislatures, prevented any such situation as that which made necessary the 1941 amendment of the state constitution in Oklahoma. We are not now concerned with the status of a bond issue for the purpose of funding nonpayable warrants, and we are not now called upon to determine whether that case should be overruled. The court assumes that the next legislature will perform its constitutional duty of making provision for the payment of any warrants which may be unpaid and unpayable at the end of the current biennium.

It being our view that the warrants outstanding at the present time are not debts within the meaning of Art. VIII, §§ 1, 2 and 3 of the state constitution, there is no basis upon which to compel the auditor to refrain from issuing the warrants here in question, and the application for a writ of mandate directed to him is denied.

The relator also seeks to prevent the state treasurer from transferring $675,000 from the general fund to the current school fund. The right of the legislature to make transfers from the general fund to other designated funds from which appropriations are made is not questioned. The issue raised is one of priority, it being urged by the relator that, under the statutes, registered warrants are paid in order of number (Rem. Rev. Stat., §§ 5516, 11026 [P.P.C. §§ 956-9, -21]) and the money in the general fund available for their payment should not be transferred to other funds.

It is conceded that there is no statutory or constitutional provision determining priority as between registered warrant holders and transfers from the general fund to specifically designated funds such as the current school fund, which is the proposed transfer here challenged. However, when the warrants in question were issued, every warrant holder knew or was charged with knowledge that there were statutory enactments setting forth procedures (not here necessary to be detailed) by which it becomes the duty of the state treasurer, within a limited period after receiving necessary information from the director of the budget as to amounts, to make monthly transfers from the general fund to various designated funds, including the current school fund. Rem. Supp. 1945, §§ 4940-3, 5517-1, 5517-2. The warrant holders accepted their warrants subject to the mandate imposed upon the state treasurer to make the transfers required by statute. Neither the warrant holders nor the relator on their behalf can prevent the state treasurer from making the proposed transfer of $675,000 from the general fund to the current school fund in compliance with the statutes directing such transfer.

The application for a writ of mandate directed to the state treasurer is also denied.

ALL CONCUR.