[No. 37904. En Banc. February 16, 1965.]

THE STATE OF WASHINGTON, *on the Relation of H. K. Wittler, Respondent,* v. CLIFF YELLE, *as State Auditor, et al., Appellants.**

*Reported in 399, P. (2d) 319.

*The Attorney General, Philip H. Austin* and *Robert F. Hauth, Assistants*, for appellants.

*Garvin, Ashley & Foster, Paul P. Ashley*, and *William H. Ellis, Jr.*, for respondent.

*Harold S. Shefelman* (*Roberts, Shefelman, Lawrence, Gay & Moch, George M. Mack*, and *Larry M. Carter*, of counsel), amici curiae.

HALE, J.—When the 1963 session of the legislature increased pensions for all public school teachers retiring after the effective date of the enactment, and admonished succeeding sessions of the legislature to fund the increases from the state's general fund for a period of 50 years, did it put the state in debt beyond the $400,000 limit fixed by Article 8, § 1, of the state constitution? The trial court, answering in the affirmative, declared the legislation unconstitutional and void, and permanently enjoined the State Auditor,

State Treasurer and Board of Trustees, Washington State Teachers' Retirement System, from granting the increases or taking any steps to fund the pension increases in the future. Acting for the state, these public officers bring this appeal.

Laws of 1963, Ex. Ses., chapter 14, p. 1360, taking effect July 1, 1964, deals with teachers' retirement and pensions generally. Sections 11 and 16 of the act provide increases in pensions and retirement to teachers retiring after the effective date. Respondent taxpayer, alleging that he has no plain, speedy and adequate remedy at law and pointing out that all teachers retiring on or after July 1, 1964, will benefit by the increase, brought this action for a declaratory judgment and injunction to restrain the state from proceeding to put the legislation into effect. The Attorney General answered, asserting the legality of Laws of 1963, Ex. Ses., chapter 14, §§ 11 and 16, pp. 1372, 1375, and moved for a summary judgment declaring them constitutional and valid under the Washington State Constitution, Art. 8, §§ 1, 2 and 3. Before epitomizing the positions taken by the parties in the case, we set out the two provisions of Laws of 1963, Ex. Ses., chapter 14, involved in this appeal, and which the trial court adjudged to be unconstitutional and void.

Section 11 provides:

"For the purpose of establishing and maintaining an actuarial reserve adequate to meet present and future pension liabilities of the system and to pay for one-half of the operating expenses of the system, the board of trustees at each regular July meeting next preceding a regular session of the legislature shall compute the amount necessary to be appropriated during the next legislative session for transfer from the state general fund to the teachers' retirement system during the next biennium. Such computation shall provide for amortization of unfunded pension liabilities over a period of not more than fifty years from the effective date of this 1963 amendatory act. The amount thus computed as necessary shall be reported to the governor by the secretary-manager of the retirement system for inclusion in the budget. The legislature shall make the necessary appropriation from the state general fund to the teachers' retirement system after considering the estimates as prepared

and submitted, and shall appropriate from the teachers' retirement fund the amount to be expended during the next biennium for operating expenses. The transfer of funds from the state general fund to the retirement system shall be at a rate determined by the board of trustees on the basis of the latest valuation prepared by the actuary employed by the board, and shall include a percentage contribution of the total earnable compensation of the members for the biennium for which the appropriation is to be made, to be known as the 'normal contribution,' and an additional percentage contribution of such earnable compensation, to be known as the 'unfunded liability contribution.' Such transfers from the general fund shall be made before the end of each calendar quarter at the rate determined by the board of trustees and shall be computed on the basis of the members' total earnable compensation received for the quarter. The members' total contributions to the teachers' retirement fund for each quarter shall serve as the basis for determining the members' total earnable compensation for the quarter. The amounts transferred shall be distributed first to the teachers' retirement fund for the payment of pensions, survivors' benefits and the state's share of the operating expenses for the system, and the balance shall be credited to the teachers' retirement pension reserve fund. The total amount of such transfers for a biennium shall not exceed the total amount appropriated by the legislature." Laws of 1963, Ex. Ses., chapter 14, § 11, p. 1372.

Section 16 declares:

"Any member who qualifies for a retirement allowance which is effective on or after the effective date of this 1963 amendatory act shall receive a retirement allowance consisting of: (1) An annuity which shall be the actuarial equivalent of his accumulated contributions at his age of retirement, (2) A service pension which shall be equal to one one-hundred twentieth of his average earnable compensation for his five highest compensated years of service within the last ten years times the total years of creditable service established with the retirement system: *Provided,* That no member shall receive a pension of less than four dollars per month for each year of creditable service established with the retirement system. Pension benefits payable under the provisions of this section shall be prorated on a monthly basis and paid at the end of each month: *Provided, further,* That the benefits under this section shall be available only to members who terminate public school service

in this state on or after the effective date of this 1963 amendatory act and shall include such members who terminated public school service in this state at the close of the 1963-1964 school year." Laws of 1963, Ex. Ses., chapter 14, § 16, p. 1375.

By written stipulation, the parties agreed, *inter alia,* that:

" . . . the state of Washington, through enactment of the aforesaid 1963 legislation, will . . . *incur a contingent liability* substantially in excess of $400,000. No portion of this contingent liability is the result of the issuance of bonds under chapter 14 or any other existing statute." (Italics ours.)

Respondent, alluding to this stipulation, argues that the contingent liability created by the statute, being funded by future appropriation from the general fund, is in legal essence a debt and refers us to our language in *State ex rel. State Finance Committee v. Martin,* 62 Wn. (2d) 645, 384 P. (2d) 833. In that case, holding certain bonds invalid because they were to be redeemed from future sales taxes—taxes levied generally—and thus created a debt in violation of the constitution's debt limitation provisions, we asked what constitutes a debt of the state. Our answer, that any obligation which must in law be paid from any taxes levied generally is a debt of the state, says respondent, makes the contingent liability created by the pension statutes—since it too must ultimately be paid from the general fund—likewise a debt of the state. To reason otherwise, argues respondent, is to ignore the actuarial facts of life—something that neither the courts nor the legislature ought to do.

Urging that since, under *Bakenhus v. Seattle,* 48 Wn. (2d) 695, 296 P. (2d) 536, pensions are deferred compensation, the right to which becomes vested when the teacher performs a service in reliance on its promise, respondent says that the debt concept is inescapable. And because the pensions are a collectible, enforceable obligation (*Tembruell v. Seattle,* 64 Wn. (2d) 503, 392 P. (2d) 453), which, according to actuarial science will have to be paid from the general fund—a fund replenished from taxes levied generally—the whole pattern of disparate parts, in respondent's view, fits together to create a debt under Article 8

of the state constitution. Respondent concludes that, no matter how laudable their purpose, §§ 11 and 16 cannot be sustained under our opinion in *State ex rel. Washington State Bldg. Financing Authority v. Yelle*, 47 Wn. (2d) 705, 289 P. (2d) 355.

Appellants, taking an opposite view but resorting to the same stipulation and acknowledging that Laws of 1963, Ex. Ses., chapter 14, §§ 11 and 16, pp. 1372, 1375, create a contingent liability, refer us to our statement in *Comfort v. Tacoma*, 142 Wash. 249, 252 Pac. 929, that a contingent liability is in no sense a debt. They then suggest that the debts interdicted by Article 8 of the state constitution refer to debts created by borrowing money, presumably through the issuance of bonds. That so clearly was this the intention of the constitution's authors, say appellants, no single case in the long history of this court has arisen where Article 8 has been held applicable to debts other than those created by borrowing money. Thus, according to appellants, even if actuarial science shows that future legislatures may have to draw money from the general fund to keep the retirement system solvent, this cannot be deemed a borrowing of money so as to constitute a debt.

Having thus outlined the positions taken by the parties and being fully mindful of their advocacy and scholarship in the premises, we must, nevertheless, look to the constitution itself for ultimate guidance.

To measure a statute's constitutionality, we lay it alongside the constitution. Article 8 of the state constitution declares:

"§ 1 LIMITATION OF STATE DEBT. The state may to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever.

"§ 2 POWERS EXTENDED IN CERTAIN CASES. In addition to the above limited power to contract debts the state may

contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised and to no other purpose whatever.

"§ 3 SPECIAL INDEBTEDNESS, HOW AUTHORIZED. Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by, or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created, and such law shall be published in at least one newspaper in each county, if one be published therein, throughout the state, for three months next preceding the election at which it is submitted to the people." Art. 8, §§ 1, 2 and 3.

First, we note that pension increases have had express constitutional sanction in this state since 1958 when the people adopted amendment 35 to the state constitution. Const. Art. 2, § 25. This amendment, while expressly re-enacting Art. 2, § 25, forbidding extra pay or increases in public compensation after performance of contractual obligations or during a term of office, added a new provision thereto specifically allowing increases in pensions:

"The legislature shall never grant any extra compensation to any public officer, agent, employee, servant, or contractor, after the services shall have been rendered, or the contract entered into, nor shall the compensation of any public officer be increased or diminished during his term of office. *Nothing in this section shall be deemed to prevent increases in pensions after such pensions shall have been granted.*" (Italics ours.) Amendment 35.

*Luders v. Spokane,* 57 Wn. (2d) 162, 356 P. (2d) 331, applied this constitutional provision in upholding an increase in police pensions after the grant thereof, yet affirms the

idea that a pension represents neither a gift nor a bonus but a part of the public officer's remuneration.

■ That a pension to one in the public service is not a gratuity but rather a form of deferred compensation for services performed, the right to which commences to vest upon entry into the retirement system and becomes an enforceable obligation in the courts upon fulfillment of all conditions under which it is to be paid, is the law of this state. But the rule that the right begins to vest with the performance of the services does not render the pension program completely rigid; a measure of flexibility survives for the purpose of maintaining the integrity of the retirement system. *Bakenhus v. Seattle,* 48 Wn. (2d) 695, 296 P. (2d) 536; *Tembruell v. Seattle,* 64 Wn. (2d) 503, 392 P. (2d) 453; *Allen v. Long Beach,* 45 Cal. (2d) 128, 287 P. (2d) 765. This area of flexibility, narrow though it may be, has some degree of influence on the question of whether legislation authorizing or increasing pensions or retirement creates a state debt in contemplation of the constitution. Does not this small area of uncertainty, when coupled to the larger variables as to which and precisely how many persons in whatever amounts will acquire enforceable rights to the pension, by fulfilling the conditions for its payment, likewise materially affect the ultimate conclusion as to whether or when a debt is created?

■ When the parties sought to synthesize these and other variables into one basic concept by defining them as a contingent liability, they did not erase their inherent uncertainty or supply sufficient definition to them to establish a determinant.

Giving a name to the legal relationships arising from the legislation or labeling it among the catalogue of familiar legal concepts, while perhaps helping to frame the issues and contribute to the ratio decidendi, does not disclose its essence. It may partake of one concept or another or parts of many.

Accordingly, we suggest that in defining the pension increases by stipulation as a contingent liability, the parties cannot by their agreement be permitted to control the

constitution's meaning. Parties to an action may not by agreement, either directly or indirectly, through stipulation, shape the significance of the constitution's language or bind the courts to their views as to what is intended by the words of the constitution. Were we to hold otherwise, the constitution would soon derive its meaning from individual and varying viewpoints and lose its status as a basic and fundamental law. Thus, in characterizing Laws of 1963, Ex. Ses., chapter 14, §§ 11 and 16, pp. 1372, 1375, as creating a contingent liability, the parties have neither added to, changed, nor imparted any significance to the meaning of Art. 8, §§ 1, 2 and 3.

█ Public pensions and retirement annuities, we would say, are *sui generis,* not readily subject to classification, but dependent in each instance for an understanding of their precise legal properties on the intentions of and the language employed by the legislative authority enacting them into law. Or, in some areas, they may fall largely within and be governed by contract. What the retirement plan accomplishes, its mode and manner of operation, the rights, duties and responsibilities engendered by it, all must be gathered from the legislative enactment and the contractual elements bringing it into existence.

Thus, in seeking to learn what the constitution means by *debt,* it matters little whether the obligation of the state to pay a pension at the time it becomes due may be correctly labeled either a contingent liability, a contingent debt, a contractual obligation, a commitment, a moral duty coupled with an enforceable right, or a solemn covenant which the state is in honor bound to keep. Whatever label may be attached, our problem remains to determine if the admonition by the legislature to future sessions that they appropriate sufficient funds to keep the teachers' retirement system solvent created a debt within the meaning of Article 8.

█ This court has many times said what Article 8 means by the word "debt." We think that it means borrowed money; it denotes an obligation created by the loan of money, usually evidenced by bonds but possibly created

by the issuance of paper bearing a different label. We think that our decision in *State ex rel. Troy v. Yelle,* 36 Wn. (2d) 192, 217 P. (2d) 337, holding that the issuance of warrants—as distinguished from bonds—did not create a debt under Article 8, largely resolves the issues of this case. As a part of the ratio decidendi, we said:

"It is our interpretation that 'debt,' within the purview of Art. VIII, §§ 1, 2 and 3, is *borrowed money* and not warrant obligations for the payment of the current expenses of the state government such as services rendered and materials furnished.

"We make no pretensions to infallibility or absolute certainty, nor are all of us persuaded that the result achieved is a desirable one under our present system of taxation. We are persuaded, however, that the framers of the constitution had in mind *two types of obligations,* those for current expenses and *those for the repayment of money borrowed, and that,* as used by them, *the word 'debt'* in Art. VIII, §§ 1, 2 and 3, and Art. VII, § 1 (as originally adopted), *had reference only to the second type of obligation.*" (Italics ours.)

To emphasize this point, we said elsewhere in that opinion:

"Here again it seems to us that, when the men who drafted the constitution used the word 'debt,' they were thinking solely in terms of borrowed money."

That this court has historically considered state debts within the meaning of Art. 8, §§ 1, 2 and 3 of the state constitution to mean obligations arising from the borrowing of money may be seen from a panoramic view of our cases affecting constitutional debt limitation. With but two exceptions, *Allen v. Grimes,* 9 Wash. 424, 37 Pac. 662, and *State ex rel. Troy v. Yelle,* 36 Wn. (2d) 192, 217 P. (2d) 337, each involving warrants, all cases have concerned borrowed money, debts created by the issuance of bonds. *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *State Capitol Comm. v. State Bd. of Finance,* 74 Wash. 15, 132 Pac. 861; *State ex rel. State Capitol Comm. v. Lister,* 91 Wash. 9, 156 Pac. 858; *State ex rel. State Capitol Committee v. Clausen,* 134 Wash. 196, 235 Pac. 364; *Comfort v. Tacoma,* 142 Wash. 249, 252

Pac. 929; *State ex rel. Bugge v. Martin,* 38 Wn. (2d) 834, 232 P. (2d) 833; *Gruen v. State Tax Comm.,* 35 Wn. (2d) 1, 211 P. (2d) 651, reversed in *State ex rel. State Finance Committee v. Martin,* 62 Wn. (2d) 645, 384 P. (2d) 833. We know of no cases decided by us since statehood in which we have held Art. 8, §§ 1, 2 and 3 applicable to other than borrowed money.

*State ex rel. State Bldg. Financing Authority v. Yelle,* 47 Wn. (2d) 705, 289 P. (2d) 355, cited by respondent, seems no exception to this line of cases for there we held that the issuance of *bonds* to finance the construction of public buildings through a leasing arrangement with the state's own institutions and agencies put the state in debt beyond the limits fixed by the constitution. Since, under the act, the legislature was obliged to appropriate to each leasing institution and agency sufficient funds for the rentals, we held on final analysis that the state was actually issuing bonds payable from general taxes. In short, it was borrowing money by selling bonds against the state's general fund.

Nor does *State ex rel. State Finance Committee v. Martin, supra,* depart from the idea that Art. 8, § 1, uses the word "debt" to mean a debt incurred through the borrowing of money. When in that case we answered the question: What is a debt of the state of Washington? by saying it was any obligation which must in law be paid from any taxes levied generally, we were referring to debts created by the issuance of bonds to be redeemed from sales taxes—excise taxes which are levied generally—hence debts created by borrowing money. Our reasoning in that case must be deemed peculiarly applicable to the facts then before us. General statements in every opinion are to be confined to the facts before the court, and limited in their application to the points actually involved. *Peterson v. Hagan,* 56 Wn. (2d) 48, 351 P. (2d) 127.

Our views find strong support in the recent case of *Columbia Cy. v. Board of Trustees of the Wisconsin Retirement Fund,* 17 Wis. (2d) 310, 116 N.W. (2d) 142 (1962), which held that a statute requiring counties to contribute

to the retirement fund of public employees for current and past services performed, the past services to be amortized over a 40-year period, did not create a debt within the debt limitation provisions of the state constitution. Similarly, *City of Passaic v. Consolidated Police & Firemen's Pension Fund Comm.*, 18 N.J. 137, 113 A. (2d) 22; *State ex rel. Board of Governors of West Virginia University v. Sims*, 133 W. Va. 239, 55 S.E. (2d) 505.

■ We have come to the conclusion, therefore, that, since the state has neither borrowed any money nor issued any bonds. debentures, certificates or other instruments by which a debt may be evidenced under and by virtue of Laws of 1963, Ex. Ses., chapter 14, §§ 11 and 16, pp. 1372, 1375, we find both sections to be a valid and constitutional exercise of the legislative power.

The judgment is, therefore, reversed with directions to dismiss the complaint and quash the injunction.

ROSELLINI, C. J., FINLEY, WEAVER, HUNTER, and HAMILTON, JJ.. and SHORETT, J. Pro Tem., concur.

HILL and DONWORTH, JJ., concur in the result.