# President Reagan's Ability to Receive Retirement Benefits from the State of California

Payment to President Reagan of the state retirement benefits to which he is entitled is not intended to subject him to improper influence, nor would it have any such effect, and therefore his receipt of such benefits would not violate the Presidential Emoluments Clause. U.S. Const., Art. II, § 1, cl. 7.

Even if the Presidential Emoluments Clause were interpreted strictly on the basis of the dictionary definition of the term "emolument," it would not prohibit President Reagan's receipt of state retirement benefits since under state law those benefits are neither a gift nor a part of the retiree's compensation.

The role of the Comptroller General in enforcing compliance with the Presidential Emoluments Clause is debatable, the penalty for a violation is unclear, and the Constitution might in any case make questionable the withholding of any part of the President's salary for an indebtedness to the United States.

June 23, 1981

## MEMORANDUM OPINION FOR
## THE COUNSEL TO THE PRESIDENT

This responds to your request for our opinion whether the receipt by President Reagan of the retirement benefits to which he became entitled as the result of his service as Governor of the State of California conflicts with the Presidential Emoluments Clause of the Constitution, which provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and *he shall not receive within that Period any other Emolument from the United States, or any of them.*

U.S. Const., Art. II., § 1, cl. 7 (emphasis added).

We have been advised that, while serving as Governor of the State of California, the President elected to become a member of the Legislators' Retirement System pursuant to § 9355.4 of the California Government Code. He became entitled to, and has drawn, retirement benefits under that system since the expiration of his second term as Governor in 1975. The California Legislators' Retirement System is contributory, § 9357, and the benefits under it are based on length of service, § 9359. According to the decisions of the California courts, the benefits under the state retirement systems, including the one of which President

187

Reagan is a member, constitute vested rights. They are not gratuities which the state is free to withdraw. *Betts* v. *Board of Admin. of Pub. Employees' Ret. System,* 21 Cal. 3d 859, 863 (1978). *See also Kern* v. *City of Long Beach,* 29 Cal. 2d 848, 851, 853 (1947).

## I.

The word "emolument" is an archaic term. The Oxford English Dictionary defines it as "profit or gain arising from station, office, or employment: reward, remuneration, salary." It also gives the obsolete meanings of "advantage, benefit, comfort." Webster's Third New International Dictionary contains similar definitions.

The extant records of the Constitutional Convention are silent regarding the purposes which Article II, § 1, clause 7, and related Article I, § 9, clause 8 [1] were intended to serve. Both clauses, however, were discussed during the State Ratification Conventions. *The Federalist No. 73,* attributed to Alexander Hamilton, explains that Art. II, § 1, clause 7 was designed to protect "the independence intended for him [the President] by the Constitution," so that neither Congress nor the states could

> weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice. Neither the Union, nor any of its members, will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act. [2]

*Id.* at 442.

Governor Randolph gave a similar explanation of the purposes underlying Article I, § 9, clause 8 in the Virginia Ratification Convention. He stated that it had been prompted by the gift of a snuff box by the King of France to Benjamin Franklin, then Ambassador to France. It therefore "was thought proper, in order to exclude corruption and foreign influence, to prohibit anyone in office from receiving or holding any emoluments from foreign states." 3 M. Farrand, Records of the Federal Convention of 1787 327 (rev. ed. 1937, 1966 reprint). Governor Randolph used the term "emolument" in the sense of a present rather than compensation for services. From this history, it appears that the term emolument has a strong connotation of, if it is not indeed limited to, payments which have a potential of influencing or corrupting the integrity of the recipient. To our knowledge, these two provisions were interpreted by federal authorities in that manner in all but one of the incidents in which this problem arose.

---

[1] Article I, § 9, clause 8 provides in pertinent part "no person holding any Office of Profit or Trust under them [the United States] shall without the Consent of the Congress, accept any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State."

[2] The "first act" refers to the legislation governing the President's compensation which is in effect at the beginning of the period for which he is elected.

In 1902 Acting Attorney General Hoyt explained that the purpose of Article I, § 9, clause 8 was "particularly directed against every kind of influence by foreign governments upon officers of the United States . . . ." 24 Op. Att'y Gen. 116, 117 (1902).

A similar approach was taken by the Comptroller General [3] in 1955 in the case of a former German judge who, after his removal from office by the national-socialist regime, had emigrated to the United States and become an attorney in the Department of Justice. After World War II, as the result of the German indemnification legislation, the enactment of which was required by the United States occupation authorities, he received from the German government a lump sum payment and an annuity for life in compensation for the wrongful dismissal. The Comptroller General ruled that those payments did not constitute emoluments directly stemming from his former office, but that they "represent damages payable as a direct result of a moral and legal wrong." 34 Comp. Gen. 331, 334 (1955). In addition the Comptroller General felt it "appropriate" to determine whether the receipt of the indemnity would violate the spirit of the Constitution. Referring to Acting Attorney General Hoyt's opinion, *supra*, he considered the test to be whether the payments were intended to influence, or had the effect of influencing, the recipient as an officer of the United States. The Comptroller General held that not to be the case in these circumstances. *Id.* at 335.

The same analysis of the problem was made by this Office in 1964 in connection with the question whether the estate of President Kennedy was entitled to the naval retirement pay that had accrued while he was President. A memorandum prepared in this Office was based on the consideration that Article II, § 1, clause 7 has to be interpreted in the light of its basic purposes and principles, *viz.*, to prevent Congress or any of the states from attempting to influence the President through financial awards or penalties.[4] It concluded that this constitutional purpose would be

> in no wise furthered by interpreting the clause as prohibiting the President from continuing to receive payments to which he was, prior to his taking office, entitled as a matter of law and for which he does not have to perform any services or fulfill any other obligations as a condition precedent to receipt of such payments.

---

[3] On the role of the Comptroller General in this area, see the Annex to this memorandum.

[4] Since Robert Kennedy was Attorney General at the time when this matter was before the Department of Justice, it was felt that the Department of Justice should take no official position on the question involved. Instead, the Office of Legal Counsel furnished to the General Accounting Office a staff memorandum which "should not be deemed an official utterance of the Department. It is an unofficial work-product supplied for whatever the idea may be worth to you (the General Counsel, General Accounting Office)." Letter from Assistant Attorney General Schlei to General Counsel Keller, General Accounting Office, dated October 13, 1964, and attached staff memorandum, dated October 12, 1964.

189

The General Accounting Office denied the claim, not on the ground that its allowance would violate the Constitution, but on the statutory basis that the President had received active duty pay as Commander-in-Chief of the Armed Forces and therefore was precluded by 10 U.S.C. § 684 and 38 U.S.C. § 314(c) from receiving retired pay for the same period.[5]

Hence, if Article II, § 1, clause 7 is to be interpreted only on the basis of the purposes it is intended to achieve, it would not bar the receipt by President Reagan of a pension in which he acquired a vested right 6 years before he became President, for which he no longer has to perform any services, and of which the State of California cannot deprive him.

## II.

The result would be the same, under California law, if Article II, § 1, clause 7 were interpreted exclusively on the basis of the dictionary meaning of the term emolument. The Comptroller General took that approach in 1957 when he was confronted with the question whether the receipt by a federal court crier of a pension from the British government for war services violated Article I, § 9, clause 8 of the Constitution. Disregarding the issue whether the receipt of the pension could have the effect of enabling the British government to influence the court crier in its favor, the Comptroller General ruled that the receipt of the pension would violate that constitutional provision, because a pension constituted either a "gratuity" or a "deferred compensation." If a "gratuity," it was a present, if "deferred compensation" was compensation for services and therefore came within the dictionary definition of the term emolument. 37 Comp. Gen. 138, 140 (1957).

Assuming, *arguendo*, that the Comptroller General was correct in limiting himself to the issue whether the pension was to be classified technically as a gift or compensation for services and, hence, constituted an emolument in the dictionary sense[6] regardless of whether it had the potential of influencing the recipient in favor of the British government, we would not say that his ruling was erroneous. Under British law the pension may have been a gift or compensation for past services. Rulings of the courts of California interpreting Article 16, § 6

---

[5] Letter from General Counsel Keller, General Accounting Office, to Assistant Attorney General Schlei, dated November 1, 1964.

[6] *See*, however, state court decisions such as *Opinion of the Justices*, 117 N.H. 409, 411 (1977), and *Campbell* v. *Kelly*, 157 W. Va. 453, 464, 466 (1974), which point to the irrelevance of the dictionary definition of the term emolument in this context. Those decisions are based on the consideration that modern retirement systems do not give rise to the evils at which the prohibitions against emoluments, gifts, and pensions in 18th and 19th century constitutions were directed. They therefore conclude that these benefits are not "within the contemplation" of such prohibitions. On the development of pensions from arbitrary grants to favorites and persons "who could be counted on to do the government's bidding" to a politically neutral system of insurance, *see* 12 *Encyclopedia of the Social Sciences*, pp. 65–69, *s.v.* Pensions (1934).

of the California Constitution, which prohibits the gifts of public moneys, and Article 4, § 17 and Article 11, § 1, which prohibit the grant of extra compensation by local governments after services have been rendered, however, have determined that in California retirement benefits such as those received by President Reagan are neither gifts nor compensation for services.

The California courts have established firmly that the benefits under the California pension or retirement statutes are not gifts. *O'Dea* v. *Cook,* 176 Cal. 659, 661-62 (1917), *Sweesy* v. *Los Angeles etc. Retirement Board,* 17 Cal. 2d 356, 359-60 (1941), and the authorities there cited; *Kern* v. *City of Long Beach,* 29 Cal. 2d 848, 851, 853 (1947), and the authorities there cited.

California decisions holding that retirement benefits are not gratuities, however, frequently characterize them, as do rulings in other jurisdictions, as "deferred benefits" or "deferred compensation." See *Kern* v. *City of Long Beach, supra,* at 852, 855, *Miller* v. *State of California,* 18 Cal. 3d 808, 815 (1977). If retirement benefits actually constituted compensation, even though deferred, Article 4, § 17, and Article 11, § 1 of the California Constitution would prohibit them to be increased subsequent to the rendering of the services for which they were earned, in particular after retirement. The California courts, however, have realized, as have the courts of many other jurisdictions,[7] that the term "deferred compensation" is essentially convenient shorthand for the conclusion that retirement benefits are not gifts or gratuities, and that it may not be taken literally.

In *Sweesy* v. *Los Angeles, etc. Retirement Board, supra* at 361-63 (1941), which involved an increase of pension benefits after the employee had retired, the Supreme Court of California rejected the notion that pensions are simply additional or increased compensation and, observing (at 362) that the definition of retirement benefits as additional or increased compensation "may not be accurate in every case," it created the concept that pension benefits are derived from the "pensionable status," [8] See also *Nelson* v. *City of Los Angeles,* 21 Cal. App. 3d 916, 919 (1971). Under California law retirement benefits therefore constitute an incident of the pensionable status. They are neither a gift nor a part of the retiree's compensation, earned while employed, the payment of which is deferred until after his retirement. In any event, regardless of any dictionary definition, retirement benefits are not

---

[7]Some states have held that the "deferred compensation" description of retirement benefits is misleading and that those benefits are *sui generis,* not readily subject to classification. *See, e.g. State ex rel. Wittler* v. *Yelle,* 65 Wash. 2d 660 (1965). Illinois and New Mexico liken retirement benefits to insurance contracts, *Raines* v. *Board of Trustees Pen. Fund.* 365 Ill. 610 (1937), *State ex rel. Hudgins* v. *Public Employees Retirement Board,* 58 N.M. 543 (1954). Still others hold that retirement benefits are not compensation for past services but an inducement to remain in service and to retire when superannuated. *See, e.g. Rochlin* v. *State,* 112 Ariz. 171 (1975).

[8]For an analysis of the concept of "pensionable status" *see Jorgenson* v. *Cranston,* 211 Cal. App. 2d 292, 298-300 (1962).

emoluments within the meaning of the Constitution because interests of this kind were not contemplated by the members of the Constitutional Convention of 1789.[9]

In sum, the receipt by President Reagan of his California retirement benefits does not violate the language of Article II, § 1, clause 7 of the Constitution because those benefits are not emoluments in the constitutional sense. Similarly, such receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence. The principal question presented by you therefore must be answered in the negative. In view of this conclusion, it is not necessary to answer the subsidiary questions raised in the last paragraph of your inquiry.

The Attorney General and Assistant Attorney General Olson have not participated in the preparation of this opinion.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

Annex Attached

---

[9] *See* n 6, *supra.*

# ANNEX

The role of the Comptroller General in this field is debatable. His involvement in this issue usually resulted from agency inquiries as to the legality of the payment of salary to employees who received payments from a foreign government. The opinions of January 12, 1955, 34 Comp. Gen. 331 (1955) and August 26, 1957, 37 Comp. Gen. 138 (1957) assume without explanation that an employee of the United States who accepts any emolument from a foreign government in violation of Article I. § 9, clause 8 of the Constitution forfeits the entire compensation for his employment by the federal government. The subsequent decisions of September 11, 1964, 44 Comp. Gen. 130 (1964) and of April 9, 1974, 53 Comp. Gen. 753, 758 (1974) concede that Article I, § 9, clause 8 does not specify the penalty to be imposed for its violation. The opinions, however, assert without any statutory basis that "substantial effect" can be given to the clause by withholding from the employee's pay an amount equal to the one which he received in violation of the Constitution. This result is in marked contrast to the position long held by the Comptroller General that in the absence of specific statutory authority his Office is not justified in setting off against the salaries of government employees any debts owed by them to the government, even if those debts are liquidated and undisputed. 29 Comp. Gen. 99 (1949).[10]

Additional problems would be presented if the Comptroller General sought to reduce the President's salary by the amount of the retirement benefits he receives from the State of California. Article II, § 1, clause 7 provides that the President's salary shall not be diminished during the period for which he shall be elected. The corresponding provision of Article III, § 1, which prohibits the diminution of the salary of Article III judges during their continuance in office, has been interpreted as prohibiting the withholding of a judge's statutory salary for an alleged indebtedness to the United States. *Smith* v. *Jackson,* 241 Fed. 747, 758 (D.C.C.Z. 1916), *aff'd on the opinion below,* 241 Fed. 747, 777 (5th Cir. 1917), *aff'd* 246 U.S. 388 (1918).

---

[10] The Comptroller General adhered to this opinion as recently as May 8, 1979, File B-189154.